JARON R. RUSSELL,            :
    Claimant,              :
                          :       **No. 3:18-CV-00450 (VLB)**
    v.                      :
                          :
**NANCY A. BERRYHILL, *ACTING***   :       **March 27, 2019**
***COMMISSIONER OF SOCIAL***    :
***SECURITY*,**                    :
    Commissioner.       :
                          :

## MEMORANDUM OF DECISION

Claimant Jaron R. Russell ("Mr. Russell" or "Claimant") challenges the Commissioner of Social Security's final decision to deny his application for disability benefits pursuant to 42 U.S.C. § 405(g). Mr. Russell moves to reverse or remand the decision, arguing that Administrative Law Judge I. K. Harrington's (the "ALJ" or "ALJ Harrington") findings are not supported by substantial evidence in the Record and/or were not rendered in accordance with law. Commissioner Nancy A. Berryhill, Acting Commissioner of Social Security (the "Commissioner"), moves to affirm the Commissioner's final decision. For the reasons stated below, the Court GRANTS the Commissioner's motion to affirm and DENIES Claimant's motion to reverse.

## Background

As a child, Claimant was diagnosed with epilepsy. Claimant stopped having seizures around age eight but started experiencing them again in March 2011. On April 7, 2014, Claimant filed for disability benefits and supplemental security

income.  Claimant is not insured under his own earnings record but filed as the adult child of an insured wage earner.  [R. 21].  His application was denied initially on April 23, 2014 and reconsideration was denied on September 5, 2014.  Claimant thereafter requested a hearing, which ALJ Harrington held on April 13, 2016.  At the time of the ALJ's decision, Claimant was twenty-two years old.  He had completed high school and was taking college classes part-time.  [Dkt. 24-2 (Stipulation of Facts) at ¶ 1].  On July 5, 2016, ALJ Harrington issued her decision finding Claimant is not disabled under the Social Security Act ("SSA") and denying his application for benefits.  Claimant initiated this action on March 16, 2018 and moved to reverse the Commissioner's decision on July 31, 2018.  The Commissioner subsequently moved to affirm the decision of the Commissioner.

In accordance with the standing order on social security appeals, the parties filed a stipulation of facts, [Dkt. 42-2], which the Court hereby incorporates in full.

I.  Medical History

Claimant had a history of epilepsy as a child.  [R. 505].  After no seizures for a number of years, on March 13, 2011, at age seventeen, Claimant presented to the emergency room complaining of headache, dizziness, and vomiting following a suspected seizure.  [R. 505, 825-46].  A CT scan of Claimant's head was normal.  [R. 514, 830].  Dr. Ionita started Claimant on an anticonvulsant, Trileptal.  [R. 467].  On April 14, 2011, Claimant saw a neurologist, Dr. David Shiling, for evaluation.  [R. 467, 806, 819].  Dr. Shiling agreed with the Trileptal prescription and instructed Claimant he should continue to avoid driving and other dangerous activities.  [R.

474]. At a follow-up visit six weeks later, Dr. Shiling reported that the MRI and EEG of Claimant's brain were normal. [R. 471].

Claimant presented to the emergency room on July 9, 2011 following another seizure. [R. 501]. Claimant reported the breakthrough seizure to Dr. Shiling at an appointment on July 13, 2011. [R. 475]. Dr. Shiling increased Claimant's dosage of Trileptal and referred him to Yale Epilepsy Center. [R. 478].

Claimant returned to Dr. Shiling on November 15, 2011 and reported a nocturnal seizure the night before. [R. 479]. Claimant reported that there were no precipitating factors, as with his previous seizures. [R. 479]. Dr. Shiling prescribed Keppra and recommended another appointment with the Yale Epilepsy Center. [R. 482]. An EEG taken that day showed "excessive slowing bilaterally with recurrent bilateral rhythmic frontal delta occasionally associated with possible very low amplitude or phantom spikes consistent with an underlying primary seizure disorder and perhaps some sort of encephalopathy." [R. 484].

On March 13, 2012, Claimant reported to Dr. Detyniecki, a Yale physician, that he had a seizure on February 20, 2012. [R. 570]. On February 20, 2012 and March 5, 2012, Claimant's urine toxicology screen was positive for cannabis. [R. 486, 519, 705]. Claimant was seen emergently by Dr. Detyniecki on March 28, 2012 following a seizure while Claimant was at school. [R. 569]. On June 19, 2012, Claimant told Dr. Detyniecki that he continued to have breakthrough seizures despite escalating doses of Keppra and Trileptal. [R. 565, 598]. Claimant admitted to forgetting some doses of his medication. Claimant's mother had begun monitoring his medication compliance. [R. 565]. As at each of the previous visits,

on examination, Claimant was cooperative, alert, and fully oriented and he was neurologically intact with full strength throughout and had intact sensation, normal eye examination, and a normal gait.  [R. 566, 599, 904].

Claimant saw Dr. Detyniecki again on January 27, 2013, reporting episodes of nausea, then feeling hot and sweaty, but not losing consciousness.  [R. 561].  Dr. Detyniecki prescribed Lamictal, another anticonvulsant, for these auras.  [R. 561].  Claimant also reported having a seizure in December after being seizure free for six months.  [R. 561].  A February 7, 2012 MRI of Claimant's brain was normal.  [R. 598].

Claimant was taken off of Keppra in April 2013.  [R. 549].  Claimant saw Dr. Pue Farooque at Yale New Haven Hospital for evaluation of his seizures on April 19, 2013.  [R. 545, 677].  Dr. Farooque noted that Claimant's physical examination, MRI, and EEG were normal.  [R. 545-46, 677].  In June, Dr. Detyniecki switched Claimant to Oxtellar and increased his dosage; Claimant continued with Lamictal.  [R. 676].  Claimant reported that he continued to have seizures.  [R. 676].

On September 10, 2013, Claimant presented to the emergency room following two seizures in the morning.  [R. 487, 868-85].  Claimant had four additional seizures after an initial emergency room visit.  [R. 487, 868-85].  The attending physician increased Claimant's Lamictal and instructed him to continue with his other antiseizure medications.  [R. 499].  Claimant's urine analysis from the visit was positive for cannabis.  [R. 537, 669, 671].

Claimant saw Dr. Detyniecki on September 23, 2013 following the cluster of seizures earlier in the month.  [R. 526].  Dr. Detyniecki suspected that medication

4

noncompliance was an important factor in causing the additional seizures. [R. 528]. Claimant saw Dr. Detyniecki again on January 7, 2014 and reported a seizure in November and one a week prior to the visit. [R. 534]. Claimant admitted to smoking marijuana. [R. 524]. Dr. Detyniecki increased Claimant's Lamictal dosage but his assessment noted that Claimant's seizures "appear to be less often and milder (no sec GTC [general tonic-clonic, or grand mal, seizures])." [R. 525]. Claimant had another appointment with Dr. Detyniecki on April 8, 2014. [R. 655]. Claimant reported having two seizures on March 28 and complained of some headaches and spitting. [R. 655]. Dr. Detyniecki noted that Claimant was compliant with his medication regimen. [R. 655]. EEG monitoring of Claimant in June 2014 showed two seizures. [R. 620, 638-54, 921].

In connection with Claimant's disability benefits application, Dr. Maria Lorenzo reviewed the record evidence and her report dated April 23, 2014 opines that Claimant has no exertional, postural, manipulative, visual, or communicative limitations. [R. 245]. She indicated that a residual functional capacity should reflect seizure precautions. [R. 246]. Dr. Carl Bancoff reviewed the record evidence in September 2014 and opined that Claimant had no exertional limitations, but Claimant should avoid exposure to ladders and ropes. [R. 270, 272].

On October 21, 2014, Claimant saw Dr. Detyniecki and complained of intermittent blurry vision since starting on a low dose of Depakote. [R. 924]. On February 19, 2015, Dr. Detyniecki increased Claimant's Depakote dosage upon Claimant's report of a seizure the previous month. [R. 789, 927]. In August 2015,

Claimant reported having "walking seizures" twice a month and intermittent blurry vision. [R. 930]. Claimant's physical examination was normal. [R. 931].

At an appointment with Dr. Detyniecki on January 27, 2016, Claimant reported only one cluster of seizures since his August visit. [R. 933]. Claimant used Ativan after the second seizure. [R. 933]. Dr. Detyniecki's assessment reported medically refractory localization-related epilepsy (LRE) and noted that Claimant was "[d]oing better with the increased dose of Clobazam." [R. 935].

Dr. Detyniecki completed a Medical Source Statement of Mental Health on March 14, 2016. [R. 937-42]. Dr. Detyniecki indicated moderate and extreme limitations with the ability to understand, remember, and carry out instructions as well as moderate limitations to the ability to interact appropriately with supervisors, co-workers, and the public and to respond to changes in the routine working setting. [R. 938-39]. Dr. Detyniecki stated that Claimant's epilepsy limited his educational opportunities, social interactions, and ability to be independent. [R. 941]. He further explained that Claimant "has undergone numerous tests to try and pinpoint his seizure focus in the hopes that an optimal plan can be made to manage his seizure disorder. Despite being on multi-modal drug therapy, [Claimant] still has seizures which are unpredictable and totally disabling." [R. 941].

## II. ALJ Decision

ALJ Harrington rendered her decision on July 5, 2016, denying Claimant's request for disability insurance benefits and supplemental security income. [R. 11-26]. ALJ Harrington's conclusions are as follows.

ALJ Harrington first found that Claimant had not engaged in substantial gainful employment since November 30, 2011, the alleged onset date. [R. 21]. She next found that Claimant has one severe impairment—epilepsy—and intermittent diplopia (double vision), which is non-severe. [R. 21].

ALJ Harrington concluded that Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 22]. Specifically, she found that "[n]o treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." [R. 22].

Next, ALJ Harrington found that Claimant has the residual functional capacity to perform the full range of exertion, "except that he must avoid all exposure to climbing ladders, ropes and scaffolds, and unprotected heights; avoid all exposure to dangerous machinery; and avoid operating automobiles." [R. 22]. The ALJ noted that "[i]n order to determine the claimant's residual functional capacity, the undersigned ALJ has considered the functional limitations resulting from the claimant's medically determinable impairments, including those that are nonsevere." [R. 21]. The ALJ concluded that "[t]he evidence does not support a finding of any additional functional limitations other than the epilepsy-related limitations." [R. 21].

ALJ Harrington recognized that Claimant had no past relevant work experience. Claimant was born on December 10, 1993 and was twenty-two years

old at the time of the decision, which is defined as a younger individual, and has a high school diploma and reads English. [R. 27]. ALJ Harrington considered Claimant's age, education, work experience, and residual functional capacity and found that there are jobs that exist in significant numbers in the national economy that Claimant can perform. [R. 27]. The ALJ relied on testimony from a vocational expert who concluded that someone with Claimant's profile and RFC would be able to perform the requirements of representative occupations such as hotel housekeeper, price marker, and laundry worker. [R. 28].

Based on the above findings, ALJ Harrington concluded that Claimant has not been under disability, as defined by the SSA, from November 30, 2011, through the date of the decision. [R. 28].

This appeal ensued on March 16, 2018 and was fully briefed on September 17, 2018.

## Discussion

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v.*

*Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)).

To be "disabled" under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration has promulgated the following five-step procedure to evaluate disability claims:

1.  First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2.  If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4.  If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5.  Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520).

Here, Claimant first argues that the ALJ erred in according only minimal weight to the opinion of Claimant's treating physician. [Dkt. 24-1 at 5-11]. Claimant next argues that the ALJ did not properly consider the medical opinions and hearing testimony in determining his RFC and erred in finding that Claimant has the RFC to perform the full range of exertion. *Id.* at 11-14. Finally, Claimant contends that the ALJ erred in concluding that there are substantial jobs in the national economy which Claimant could perform. *Id.* at 15-17.

I. <u>Evaluation of Treating Physician Opinion Evidence</u>

The SSA recognizes a "treating physician" rule of "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). "A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). However, SSA regulations advise that a treating source's opinions "on the issue(s) of the *nature and severity of [the claimant's] impairment(s)*" will be given "controlling weight" if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(r); *see also Green-Younger*, 335 F.3d at 106.

Thus, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal citations omitted) (citing

*Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). An ALJ who declines to give controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give the opinion. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* Additionally, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).

Claimant argues that the ALJ erred by not giving substantial weight to the opinion of Claimant's treating physician, Dr. Detyniecki, a neurologist / epileptologist with Yale New Haven Hospital. [Dkt. 24-1 at 6]. ALJ Harrington explained that she accorded "minimal weight" to Dr. Detyniecki's opinion because it was not consistent with the record as a whole and the evidence did not support the extreme limitations Dr. Detyniecki cited. *See* [R. 26]. Specifically, the ALJ explained that Dr. Detyniecki's recommended limits "are inconsistent with the detailed, chronological progress notes at Yale epilepsy clinic" and Claimant's "varied and robust activities of daily living." [R. 26]. The Court's review of the record indicates that substantial evidence supports ALJ Harrington's decision to discount Dr. Detyniecki's opinion.

In the checklist portion of Dr. Detyniecki's Medical Source Statement, he indicates that Claimant has moderate and extreme limitations in his ability to understand and remember simple instruction; carry out simple instructions; make judgments on simple work-related decisions; understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions. [R. 938]. Next to this section, he noted, "When [Claimant] has a seizure he can **NOT** follow directions, does not comprehend[,] cannot speak[,] does not interact with environment or other people." [R. 938]. A reasonable interpretation of Dr. Detyniecki's Medical Source Statement is that Claimant *is* extremely limited when having a seizure but only moderately limited when he is not. [R. 938]. Dr. Detyniecki further indicated that Claimant has moderate limitations in his ability to interact appropriately with the public, supervisors, and co-workers, and marked limitations in his ability to respond appropriately to unusual work situations and to changes in a routine work setting. [R. 939]. In a narrative response, Dr. Detyniecki stated that a neuropsychological evaluation of Claimant concluded that he has difficulty with attention along with weakness in visual memory and meets criteria for math and learning disorders. [R. 939]. Dr. Detyniecki further stated that Claimant's seizures are "unpredictable and totally disabling." [R. 941]. Elsewhere in the record, Dr. Detyniecki notes that Claimant's seizures "are always in the morning." [R. 918]. Also in the Statement, he noted that Claimant's epilepsy has been "difficult to control" and has "greatly limited [Claimant's] educational opportunities, social interactions and ability to be

independent due to the safety concerns and embarrassing aspects of his Epileptic seizure activity." [R. 941].

The treatment notes generated by Dr. Detyniecki and others over five years, however, do not indicate such significant physical or mental functioning limitations. Claimant's mental status examinations were generally normal, indicating that he was alert, cooperative, and oriented to person, place, time and situation. *See e.g.*, [R. 469, 473, 477, 482, 505, 524, 527, 537, 542, 548, 566, 569, 571, 621, 656]. He was also generally found to have full strength throughout, intact sensation, normal eye examinations, and a normal gait. *See e.g.*, [R. 469-70, 473-74, 477-78, 481-82, 531-32, 534, 537, 542, 545]. Claimant's MRI and EEG results were largely normal, with limited exceptions where the abnormality was likely related to Claimant's recent seizure activity, according to Dr. Detyniecki. *See e.g.*, [R. 471, 541, 545-46, 598, 938]. Additionally, on review of the record, Drs. Lorenzo and Bancoff, similarly concluded that the evidence indicates occasional seizure episodes but ability to go to school, go out with friends, and interact with others. [R. 246, 270-72]. Claimant's regular physical and mental examinations do not indicate continual limitations beyond the somewhat unpredictable and disruptive seizure events, which the ALJ takes into account. As the above shows, substantial evidence in the record, including Dr. Detyniecki's treatment notes, contradict Dr. Detyniecki's checklist summary opinion.

Claimant argues that testimony from himself and his father support Dr. Detyniecki's Medical Source Statement. [Dkt. 24-1 at 7]. In particular, Claimant points to testimony that he experiences memory issues, requiring daily reminders

to take his medication, suffers blurry vision from bright lights, and that his father had to "Jaron-proof[]" the house to prevent Claimant from hurting himself during unpredictable "walking seizures." *Id.* This testimony does not show that the ALJ erred in giving minimal weight to Dr. Detyniecki's Statement. First, the ALJ's decision confirms that she took this hearing testimony of Claimant and his father into account in fully assessing the record and coming to the conclusions. *See* [R. 25 (noting to specific testimony from Claimant and his "parent")]. Second, the hearing testimony, when considered as a whole, does not support the conclusion that Claimant has moderate to extreme limitations in his ability to understand and remember simple instruction, carry out simple instructions, or make judgments on simple work-related decisions and marked limitations in his ability to respond appropriately to unusual work situations and to changes in a routine work setting.

Claimant and his father testified that Claimant has been taking online courses at a community college since 2013 and that he recently started attending two classes in person. [R. 187-89, 218-20]. While Claimant testified that he believes his ability to perform has lessened as a result of headaches and blurred vision, he also testified that he is passing these classes. [R. 188, 191, 203-04]. Additionally, the testimony indicates that the blurred vision is likely a side-effect of Claimant's medication and that it has lessened since his doctor took him off Depakote. [R. 194]. Claimant further testified that he is cautious about his activities in case he has a seizure, no longer playing sports and instead watching sports on television and "chill[ing] around." [R. 193, 195, 211-12]. Claimant still goes to friends' houses and interacts with other people, though he must rely on others for transportation

and has made his friends aware of his condition so that they can assist if he has a seizure. [R. 197-99]. He uses a light-emitting computer for school work and his cell phone to communicate with friends and sometimes to search the internet, though he does not use social media. [R. 209-11]. Claimant and his father also testified that his seizures now usually occur in the morning, two to three times a month on average, and that he uses Ativan to stop a cluster of seizures. [R. 195, 222].

This testimony does not support Dr. Detyniecki's indications of extreme limitations to such an extent that the ALJ erred in giving the Statement minimal weight. Rather, the testimony largely indicates that Claimant's epilepsy has not limited his daily living activities or functional capabilities to an extreme or even moderate extent. Regardless, "even where substantial evidence may support the Claimant's position" the ALJ's finding must be sustained when it is supported by substantial evidence. *Niles v. Astrue*, 32 F. Supp. 3d 273, 279 (N.D.N.Y. 2012). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The treatment notes adequately support the ALJ's conclusion that Dr. Detyniecki's checklist summary overstated Claimant's limitations and the testimony from Claimant and his father does not change this, but arguably support the ALJ's conclusion.

The Court does not find Claimant's argument regarding the June 2014 and August 2015 EEG and MRI testing convincing either. *See* [Dkt. 24-1 at 6-7]. That this testing showed seizure activity unlike previous diagnostic studies does not

change the fact that Dr. Detyniecki's opinion is inconsistent with the other record evidence. The EEG and MRI tests only show Claimant's seizures. The ALJ already found that Claimant's epilepsy is a severe impairment. The tests do not show impairment beyond the seizure episodes themselves. Thus, the tests are consistent with the ALJ's decision to discount Dr. Detyniecki's opinion to account for the fact that any extreme limitations are present only during the seizure episodes, which are infrequent, usually occur in the morning, and last only a few minutes at the most.

Claimant suggests that, as in *Flynn v. Commissioner of Social Security*, 729 F. App'x 119 (2d Cir. 2018), the ALJ inappropriately "substituted her own judgment for the treating physician's judgment regarding the severity of Claimant's epilepsy." [Dkt. 24-1 at 9]. In *Flynn*, the Second Circuit noted that "genuine conflicts in the medical evidence are for the Commissioner to resolve," 729 F. App'x at 121, but found that the other record evidence did not support the ALJ's contrary conclusion to the extent necessary and thus did not "override the treating physician's evaluation." *Id.* at 121-22. Additionally, the Second Circuit concluded that the ALJ should not have relied on the opinions of the consultative doctors who did not have the opportunity to examine the patient in discounting the opinion of the treating physician. Specifically, the court noted the opinions' "lack [of] specificity in key respects" and that the case involved mental health, "which [is] not susceptible to clear records such as x[] rays or MRIs[;] [r]ather, they depend almost exclusively on less discretely measurable factors, like what the patient says in consultations." *Id.* at 122.

This case is distinguishable from *Flynn*. First, Claimant's claim does not implicate mental health, but epilepsy, which can be, and as the record shows was, assessed with objective medical tests and records. Thus, the opinion of a treating physician is not as revealing here as it is in a mental health case. Further, review of the medical tests and records in this case presents a more accurate view of the claimant's condition than would be the case for a mental health claim. Second, unlike in *Flynn*, where the Second Circuit concluded that the longitudinal treatment notes and evidence did not support the ALJ's findings of less severe symptoms, the record evidence here does support the ALJ's conclusion that Dr. Detyniecki's Statement overstates Claimant's limitations. In this case, the medical records and treatment notes do not indicate the severe limitations that Dr. Detyniecki's Statement reports but indicate normal mental and physical examination results and normal EEGs and MRIs when Claimant is not actively seizing. The opinions of Drs. Lorenzo and Bancoff are based on and consistent with the medical records, and thus further support the ALJ's decision to discount Dr. Detyniecki's Statement.

Because Dr. Detyniecki's opinion is inconsistent with substantial evidence in the record, ALJ Harrington was not required to afford his opinion controlling weight. Moreover, because ALJ Harrington comprehensively explained the reasons for discounting Dr. Detyniecki's Medical Source Statement, he complied with the dictates of the treating physician rule. *See Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129)). Accordingly, the Court finds no legal error in the ALJ's treatment of Dr. Detyniecki's medical opinion evidence.

## II.   RFC Finding

A claimant's RFC is "what an individual can still do despite his or her limitations." SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996); *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."   SSR 96–8p, 1996 WL 374184, at *2.   "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (defining RFC as "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis") (quoting SSR 96–8p, 1996 WL 374184, at *1).  RFC is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).

The SSA explains that, in finding a claimant's RFC, "[a]lthough we consider opinions from medical sources on issues such as  . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."   20 C.F.R. §§ 404.1527(d)(2), 416,927(d)(2);   *see also Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his

decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").  An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining his or her RFC.  20 C.F.R. § 416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

Claimant argues that the ALJ erred in her finding of Claimant's RFC. Claimant contends that the ALJ based her conclusion strictly on the findings of the consultative examiners and ignored Dr. Detyniecki's Medical Source Statement as well as Claimant's testimony.  [Dkt. 24-1 at 11-14].  At the same time, Claimant suggests that the RFC is based on "several factual errors concerning Claimant's daily activities and his academic achievements."  *Id.* at 13.  Additionally, Claimant contends that the safety concerns associated with Claimant's condition require greater RFC limitations than the ALJ found.  *Id.* at 12.

First, as the decision evidences, ALJ Harrington took into consideration the full record in determining Claimant's RFC.  *See* [R. 22-27].  ALJ Harrington found that Claimant has the RFC "to perform the full range of exertion . . . except that he must avoid all exposure to climbing ladders, ropes and scaffolds, and unprotected heights; avoid all exposure to dangerous machinery; and avoid operating automobiles."  [R. 22].  ALJ Harrington explained that she considered Claimant's EEGs and MRIs, [R. 24], and treatment notes indicating that medication, when taken consistently, helped control Claimant's epilepsy, [R.25].  ALJ Harrington also explained that she considered testimony by Claimant and his father from the hearing, as well as Claimant's activities of daily living questionnaires.  *See* [R. 25-

26, 374-82, 409-17]. The ALJ's description of Claimant's activities is largely consistent with the two 2014 Forms and testimony Claimant provided at the April 2016 hearing. The ALJ found that Claimant "has no problem with personal care . . . His pertinent hobbies include video games and sports. He took online classes. He . . . recently resumed taking in-person college classes. He watches television. He socializes with friends. He uses his smart phone for texting and the internet." [R. 25]. While the testimony and questionnaires did not consistently indicate the same level of ability, ALJ Harrington acknowledged this and explained that "[o]verall, these self-described activities, including his college level work, show remarkable improvement" and found that "[h]e functions at a higher level, physically, psychologically, and even cognitively, than originally alleged in the earlier disability reports." [R. 25]. Thus, the ALJ did not improperly base Claimant's RFC only on the opinions of the consulting doctors. Additionally, as discussed above, ALJ Harrington did not err in giving only minimal weight to Dr. Detyniecki's Medical Source Statement in light of the contradictory record evidence.

Any factual inaccuracies noted in ALJ Harrington's decision are harmless error and do not require remand. *See Duvergel v. Apfel*, 2000 WL 328593, at *11 (S.D.N.Y. Mar. 29, 2000) (citing *Curry v. Sullivan*, 925 F.2d 1127, 1129 (9th Cir. 1996) (harmless error rule applies to review of denial of disability benefits)); *Allison v. Chater*, No. 96 C 3007, 1997 WL 211216, at *12 (N.D. Ill. Apr. 21, 1997) ("Since it has been determined . . . that [Claimant] can still perform work activities, the ALJ's misunderstanding of the evidence resulted in harmless error which does not

warrant reversal."). While ALJ Harrington incorrectly noted that Claimant used social media, she correctly stated that Claimant used his computer for online coursework and a smartphone to communicate with friends and search the internet. *See* [R. 25-26]. Accidental inclusion of social media use does not change the fact that Claimant acknowledged his ability to use this technology for daily activities and the ALJ's assessment of his functionality because accessing social media is only one type of use to which a computer and a cellular telephone can be put.

As for Claimant's academic record, ALJ Harrington acknowledged that Claimant had been on academic probation because of his low GPA and that his course load had to be reduced. [R. 25-26]. But as ALJ Harrington noted, Claimant's academic performance turned around in 2014. *See* [R. 455-463]. While Claimant completed only one course during the Spring 2014 semester, he received an A in that course, and he completed four courses the following semester, receiving three As and one C, yielding a B+ G.P.A. for the semester. [R. 458]. Thus, the ALJ's emphasis on Claimant's improved academic performance was not misplaced. That many of Claimant's courses have been online rather than in person and that his course load amounts to part-time does not diminish the evidentiary importance of his performance. Additionally, Claimant testified that for the Spring 2016 semester he was taking two courses in person and his attendance and performance had been satisfactory. [R. 188-89].

Next, Claimant contends that, given the safety related limitations imposed, "[i]t logically follows that the unpredictability of Claimant's seizures would then

affect the Claimant's ability to perform other work functions safely and should not be limited to using ladders and ropes." [Dkt. 24-1 at 12]. As Claimant suggests, the nonexertional RFC limitations included—no climbing ladders or operating machinery or vehicles—aim to address the safety concerns that come with the unpredictable nature of Claimant's seizures. These limitations are based on the medical opinions of Dr. Detyniecki and Dr. Bancoff and are supported by substantial evidence. *See* [R. 270, 937-41]. Claimant's suggestion that it "logically follows" that additional limitations would be appropriate is insufficient to overturn the ALJ's finding.

Additionally, substantial evidence in the record supports the ALJ's finding that Claimant can perform the full range of exertional work. Claimant was twenty-two years old at the time of the ALJ's decision and is a former athlete. Claimant has been able to complete college level coursework and continues spend time with friends. Aside from Claimant's seizures, which generally occur two to three times and month and in the morning, and occasional blurred vision resulting from bright light exposure and headaches, Claimant has no other medically documented health issues. Claimant's medical records do not indicate that Claimant's seizures are triggered by certain activity or otherwise state that Claimant should not physically exert himself to any extent. Nor does Dr. Detyniecki's Medical Source Statement suggest this. Moreover, Claimant testified that "pushing [him]self" does not "cause[] [him] too, too much trouble." [R. 201]. Testimony from Claimant's father suggesting otherwise, which is a lay opinion and not medically supported, does not negate all of this evidence.

It is Claimant's burden to demonstrate medically determinable impairments which result in functional limitations. 42 U.S.C. § 423(d)(5)(A); 68 Fed. Reg. 51153, 51154-55 (Aug. 26, 2003); 20 C.F.R. §§ 404.1512(a), 404.1545(a)(3), 416.912(a), 416.945(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity."). Claimant argues that Dr. Detyniecki's Medical Source Statement provides such evidence. But the ALJ discounted Dr. Detyniecki's Statement in accordance with the SSA regulations to account for the fact that any extreme limitations are limited to the seizure episodes themselves and substantial evidence in the record supports the absence of such limitations otherwise. Accordingly, the Court finds that the ALJ's RFC determination is supported by substantial evidence and did not involve legal error and therefore cannot be overturned.

III. <u>Finding of Employment in the National Economy</u>

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014); *see* 20 C.F.R. §§ 404.1520(f), 404.1560(c), 404.1563, 404.1564, 404.1565, 404.1566, 416.920(f). While the claimant has the general burden of proving his or her disability within the meaning of the Act, at Step Five, the burden shifts to the Commissioner to show that there is other work that the claimant can perform. *McIntyre*, 758 F.3d at 150 (citing *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam)).

An ALJ may determine whether there are significant numbers of jobs in the national economy which the claimant can perform "by applying the Medical

Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion . . . and accurately reflect the limitations and capabilities of the claimant involved." *Id.* (internal citations, quotations, and brackets omitted) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

Claimant argues that the ALJ's analysis at Step Five was flawed because she failed to "reconcile the non-exertional limitations assigned by Dr. Detyniecki and the vocational expert's testimony that Claimant could not perform substantial gainful activity based on these non-exertional limitations." [Dkt. 24-1 at 16-18]. The Court does not agree.

At the April 2016 hearing, the ALJ asked a vocational expert[1] whether an individual of Claimant's age and with his education, past work experience, and RFC can perform work available in the national economy. [R .230]. The vocational expert testified that someone with these characteristics could work as a hotel/motel housekeeper (with 394,300 jobs nationally), a price marker (with 26,400 jobs nationally), or a laundry worker (with 42,681 jobs nationally). [R. 231]. Based

---

[1] The ALJ presented the following hypothetical: "If you can, please assume an individual of the claimant's age, education, and past work experience. Further assume such individual has the capacity for the full range of exertional work; the avoidance of all exposure to climbing ladders, ropes, and scaffolding, unprotected heights, dangerous moving machinery, and operating motor vehicles. Can such an individual perform other work?"

on this testimony, the ALJ concluded that Claimant is capable of adjusting to work within his safety limitations that exists in significant numbers in the national economy. [R. 28].

The hypothetical presented to the vocational expert accurately represented Claimant's characteristics and RFC, as found by the ALJ. The Court has already affirmed that the ALJ's RFC finding is supported by substantial evidence and is not premised on legal error. As such, the analysis leading to the ALJ's conclusion is sound.

As Claimant points out, the ALJ presented additional limitations to the vocational expert at the hearing. *See* [R. 231-37]. These additional limitations were based on the checklist assessment in Dr. Detyniecki's Medical Source Statement. The ALJ subsequently concluded that it was appropriate to discount Dr. Detyniecki's opinion because the extreme limitations indicated are confined to the discrete seizure episodes and further limitations are not supported by the longitudinal medical records. It was proper for the ALJ not to rely on the hypotheticals which included the limitations she ultimately rejected. *Priel v. Astrue*, 453 F. App'x 84, 87-88 (2d Cir. 2011) ("[T]he ALJ properly declined to include in his hypothetical question symptoms and limitations that he had reasonably rejected."). Accordingly, the Court holds that ALJ Harrington did not err in concluding that Claimant was capable of performing work available in significant numbers in the national economy.

## Conclusion

For the aforementioned reasons, the Court DENIES Claimant's Motion to Reverse the Decision of the Commissioner, [Dkt. 24], and GRANTS the Commissioner's Motion to Affirm, [Dkt. 25].  The Clerk is directed to close this case.

IT IS SO ORDERED
_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut this 27th day of March 2019.